# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-2241V

| | |
|---|---|
| BRIAHNA BRYANT,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: March 20, 2024 |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Mark Kim Kellie*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On December 1, 2021, Briahna Bryant filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine she received on December 5, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to a damages figure.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of $140,000.00 for her pain and suffering (the sole compensation element at issue).

## I.     Relevant Procedural History

Approximately 11 months after this case was initiated, Respondent filed his Rule 4(c) report on November 7, 2022, conceding that Petitioner was entitled to compensation. ECF No. 17. A ruling on entitlement was thereafter issued on November 14, 2022. ECF No. 18. After a period of negotiation, the parties reached an impasse in their discussions regarding damages. ECF No. 27. Petitioner filed a motion for a ruling on the record ("Mot.") on May 31, 2023. ECF No. 28. Respondent filed a response ("Resp.") on July 31, 2023 and Petitioner filed a reply ("Repl.") on August 15, 2023. ECF No. 31, 34. I subsequently proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. ECF. No. 35. That hearing was held on March 15, 2024,[3] and the case is now ripe for a written determination.

## II.    Relevant Facts

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) report.

### a.  Petitioner's Medical History

Petitioner was a 17-year-old senior in high school at the time of her December 5, 2018 vaccination. Ex. 1 at 240. She described "immediate pain" and an "extreme burning sensation" at the time, which continued later and worsened. Ex. 2 at ¶10.

On December 18, 2018 (less that two weeks post-vaccination), Petitioner went to the ER reporting uncontrolled, intolerable pain that day and "numbness in her fingers once in a while." Ex. 1 at 200. On exam, there was slight edema at the proximal humerus with tenderness. Id. at 202. Petitioner's range of motion was not able to be tested due to pain. *Id*. An MRI was normal. *Id*. at 203. She was evaluated by a physical therapist and a neurologist. *Id*. She was prescribed medications, including gabapentin. *Id*.

---

[3] At the end of the hearing held on March 15, 2024, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

On February 25, 2019, Petitioner followed up with a pediatric neurologist. Ex. 1 at 192-94. She reported consistent right shoulder pain since her vaccination which had "waxed and waned but never gone away." *Id*. at 193. The doctor noted that "many things are better than what was described in December – improved in strength, mobility and function, certainly enough to continue to play competitive hockey." *Id*. at 194. Petitioner was referred to formal physical therapy and an EMG was ordered. *Id*. It occurred in March and produced normal results. Ex. 1 at 181-182.[4]

Petitioner saw her PCP on April 16, 2019, to refill her medications. Ex. 1 at 156. She reported that gabapentin resolved her right shoulder pain at night, allowing her to sleep. *Id*. She reported continuing to play hockey without difficulty, and that she had not done any formal physical therapy. *Id*.

On May 10, 2019, Petitioner was treated by a specialist in physical medicine and rehabilitation. Ex. 1 at 141. She reported that gabapentin resolved her pain, but that after activity, she felt "swelling with needles poking the swelling." *Id*. She reported severe pain when laying down, but that she was working out daily, going for bike rides, and playing hockey. *Id*. Petitioner was referred to physical therapy and an ultrasound was ordered. *Id*. at 145. She was also advised to find a counselor to assist with pain management strategies. *Id*.

An ultrasound performed by an orthopedist on May 20, 2019 was normal. Ex. 1 at 136. He opined that an ultrasound-guided injection may be appropriate. *Id*.

Petitioner returned to her physical medicine and rehabilitation specialist on June 19, 2019. Ex. 1 at 118. She now reported that she had stopped taking gabapentin due to side effects and that her overall pain had increased as a result. *Id*. at 120. She had not been able to go to physical therapy due to cost, and otherwise felt it would not help her. *Id*. Petitioner was given a "focused home exercise plan" to help reduce appointments and co-pays. *Id*. at 121. She was advised to follow up in 4-6 weeks – at which time a cortisone injection might be considered. *Id*.

Petitioner returned to her PCP on June 26, 2019. Ex. 1 at 105. She reported that she continued to have shoulder pain but did not feel that it limited her activities. *Id*. On exam, Petitioner's range of motion had improved and impingement testing was negative. *Id*. The doctor did not recommend additional intervention. *Id*.

---

[4] It is unclear whether the testing was completed due to Petitioner's "needle associated pain" and distress during testing. Ex. 1 at 181-182.

On August 19, 2019, Petitioner reported shoulder pain of 3-6/10 during a psychology appointment. Ex. 1 at 74.

Almost a year later, on June 10, 2020, Petitioner had a telehealth visit with her PCP during which she requested a referral back to physical medicine and rehabilitation for her shoulder pain. Ex. 1 at 56. She reported undergoing physical therapy and meeting with an athletic trainer while at college. *Id*. Petitioner stated that she had pain only "with excessive exercise," but that it had become more consistent over the past two weeks along with a slight decrease in extension. *Id*.

Six months later, on January 15, 2021, Petitioner sought treatment at the ER near her college. Ex. 3 at 41. She reported constant pain that worsened with activity. *Id.* at 41. Her pain was localized to right upper arm and radiated to the elbow. *Id*. at 42. On exam, she had mild tenderness to palpation and full range of motion. *Id*. at 43. She was given ibuprofen, a prescription for Norco, and referred to an orthopedic clinic. *Id*. at 44-45.

On January 19, 2021, Petitioner visited an orthopedic surgeon. Ex. 9 at 3. On exam, she had reduced range of motion and positive impingement signs. *Id*. at 5. A cortisone injection was administered. *Id*. at 6. An MRI revealed a posterior labral tear, mild RTC tendonitis, small GH effusion/synovitis, and subcortical cystic change/marrow edema at posterior superior humeral head. Ex. 3 at 82. The technologist noted Petitioner's pain and inability to remain still during the exam. *Id*. at 81.

Petitioner returned to her orthopedist on February 4, 2021, reporting improvement after the injection, but not complete relief. Ex. 9 at 10. She continued to play hockey and weight train during this time. *Id*. at 11. She reported trying multiple courses of PT. *Id*. The doctor believed that rotator cuff tendinitis was most likely causing her pain. *Id*. He recommended physical therapy and activity modification, including refraining from heavy lifting. *Id*. Petitioner wanted to finish the hockey season. *Id*.

Petitioner spoke to her orthopedist again on February 24, 2021 – during which he recommended finishing the hockey season. *Id*. at 12. After the season, he recommended a specified rehab program. *Id*.

Four months later, on June 17, 2021, Petitioner established care with a new PCP near her college for an annual exam and for athletic paperwork completion. Ex. 4 at 34. She reported limited range of motion and pain in the right shoulder, but no significant physical limitations. *Id*. She reported seeing an orthopedic surgeon and said she "will be getting steroid injections." *Id*. at 36.

She returned to her orthopedist on June 21, 2021, reporting that her pain had returned in the two weeks prior, and was so severe it was interfering with her sleep. Ex. 9 at 14. The doctor suggested that Petitioner consider surgery due to the worsening of her symptoms. *Id*. at 16. He referred her to physical therapy and to a neurologist to rule out other problems. *Id*.

On July 6, 2021, Petitioner had an initial physical therapy evaluation. Ex. 3 at 96. She reported right shoulder pain beginning with her flu shot and worsening over the last 2.5 years. *Id*. She reported pain that traveled down her arm into her first 2 digits. *Id*. at 97. She stated that she had done two previous courses of physical therapy and had an injection in her shoulder three months prior, which helped but wore off. *Id*. Petitioner rated her pain at 6/10, and up to 9/10 at its worst. *Id*. On exam, she had full and pain-free passive range of motion with a "little pinching at end ROM." *Id*. at 98. Her evaluation was "consistent with right shoulder instability/labral tear and RTC tendinosis." *Id*. at 99. Her treatment plan included treatment twice a week for 12 weeks. *Id*. at 100.

On August 13, 2021, Petitioner sought treatment from an orthopedic surgeon. Ex. 8 at 6. She reported right shoulder problems "on and off" over the last 3.5-4 years. *Id*. On exam, she had tenderness and positive impingement testing. *Id*. Petitioner finally decided to proceed with arthroscopic surgery. *Id*.

On September 2, 2021, Petitioner had an arthroscopic labral repair, biceps tenodesis, and subacromial decompression. Ex. 8 at 8. Two weeks after her surgery, Petitioner was cleared to drive and work, including typing. Ex. 9 at 23. At her final post-operative follow up, on October 20, 2021, Petitioner was doing "extremely well" with minimal pain. *Id.* at 28.

From November 2, 2021 through January 3, 2022, Petitioner had eight post-operative physical therapy sessions. Ex. 1 at 13-39. Throughout her course of physical therapy, Petitioner reported little pain. See *Id.* at 18, 22, 26, 30, 33, 36.

Petitioner did not seek further medical treatment for her shoulder pain.

b. *Affidavit Testimony*

During her injury, Petitioner recalled that daily tasks such as cooking, cleaning, washing and styling her hair, dressing, and caring for her dog became difficult. Ex. 2 at ¶12; Ex. 10 at ¶12. At the beginning of her injury, while still in high school, she required a note taker because she was unable to take notes in class (she is right-hand dominant), although she continued to get A's in school. Ex. 2 at ¶13; Ex. 1 at 193.

Petitioner thereafter kept playing play hockey (both in high school and college) during her injury and before her surgery, although she reported that she got less playing time and lost her position as a "penalty killer." Ex. 1 at 193. She stated that she was unable to continue playing hockey in college, forcing her to move home and change schools. Ex. 10 at ¶14.

### III.   The Parties' Arguments

#### a. Petitioner

Ms. Adams seeks an award of $165,000.00 for her pain and suffering. Mot. at 1. She argues that her SIRVA injury was severe, requiring numerous tests and substantial treatment, including a cortisone injection, physical therapy, and arthroscopic surgery. *Id.* at 27. She highlights that she was only seventeen years old at the time of her injury and that she had endured ongoing symptoms for more than four years. *Id*. Finally, Petitioner maintains that her injury is likely permanent, based on her impairment rating at the end of her treatment and her ongoing sequela. *Id*. at 31.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and thus argued that an award of $165,000.00 in pain and suffering was reasonable and appropriate given that her circumstances were comparable. Mot. at 22-26.

#### b. Respondent

Respondent maintains that a pain and suffering award of $105,000.00 is appropriate. Resp. at 8. Respondent argues that "Petitioner's medical records reflect that, although she had surgery, her treatment was conservative and had large gaps." *Id*. Respondent also highlights that Petitioner was able to continue to play competitive hockey, including at the college level, during her injury. *Id*.

Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that all of them involved "more extensive treatment" than Petitioner received. Resp. at 10. And Respondent discussed prior SIRVA cases during the hearing and in his brief as consistent with his proposed sum. Resp. at 8-10.

### IV.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

6

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## V.      Prior SIRVA Compensation Within SPU[6]

### A.      Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[7]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial

---

[6] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 88 | 1,223 | 28 | 967 |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9]

---

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### VI.     Appropriate Compensation in this SIRVA Case

#### a. Awareness of Suffering

Neither party has disputed Petitioner's awareness of her suffering and there is no evidence in the record that Ms. Bryant was unaware. Thus, I find that she had full awareness of her suffering, and proceed to analyze the severity and duration of the injury.

#### b. Severity and Duration of Pain and Suffering

Ms. Bryant's medical records and affidavits describe a moderate to severe SIRVA injury of significant duration. Petitioner sought treatment for her pain quickly - twelve days after her vaccination – and described high levels of pain. She treated consistently, but conservatively, for the first seven months after vaccination. At that time, Petitioner, who

10

was 17-years-old at the time of her vaccination, had graduated from high school and moved to college.

After this point, however, the record reveals some lengthy treatment gaps. Thus, in the 18-month period between June 2019 and January 2021, Petitioner sought formal treatment for her shoulder only once. Thereafter, however, when she returned to treatment in January 2021, she endured aggressive treatment, including a steroid injection before arthroscopic surgery and eight post-operative physical therapy sessions over the following year. Overall, her SIRVA treatment spanned three years, although Petitioner states that she has continued to experience ongoing sequelae (pain and stiffness) since the end of her treatment and argues that her shoulder deficits are permanent.

All of the above suggest that the appropriate award in this case is "above median" – and indeed neither side has requested that the pain and suffering award be less than $100,000.00.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that this is a significant SIRVA injury. Although both parties cited comparable prior SIRVA cases in both their filed briefs and during the oral argument, none of the cited cases is substantially similar. The most helpful recent case, I find, is *McKay v. Sec'y of Health & Human Servs.*, No. 21-0071V, 2023 WL 9231565, (Fed. Cl. Spec. Mstr. Dec. 11, 2023), in which $135,000 was awarded for pain and suffering. The petitioner in *McKay* sought treatment eleven days after her vaccination, rating her pain as severe at times, receiving one cortisone injection, having arthroscopic surgery, and attending seven post-operative physical therapy sessions over approximately 31 months. *Id*. at *1-4. At the end of her treatment, she continued to have minor deficits in shoulder function. *Id*. at 4. Ms. Bryant had a very similar treatment course, although she endured additional testing, including an EMG/NCV (which was painful) and an ultrasound, and had a somewhat longer course, albeit with some gaps during which she was not seeking formal treatment.[10]

While the factual similarity between Ms. Bryant's treatment course to that of the *McKay* petitioner's is strong, another factor to consider in awarding an amount for pain and suffering is the impact of an injury on one's employment and on the enjoyment of daily life activities. Petitioner has persuasively argued that the impact of her injury on her life as a young high school and college student was substantial. Petitioner stated that she

---

[10] While Petitioner states that she was receiving treatment from her athletic trainers during the gaps in medical records, there are no records of that treatment. These times without formal medical treatment provide some relevant evidence of Petitioner's ability to manage her injury during that time, even if she was still experiencing symptoms.

required note takers in class to maintain her grades and that although she continued to play competitive hockey, her playing time and role on the team was impacted. Ex. Ex. 1 at 193; Ex. 2 at ¶13; Ex. 10 at ¶14. She also highlights that she was required to have surgery at the age of 20 and that documented deficits[11] remained at the end of her treatment.

Under such circumstances, and considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that a slightly higher award of **$140,000.00** in compensation for pain and suffering is reasonable and appropriate in this case.

## CONCLUSION

In light of all of the above, the I award **Petitioner a lump sum payment of $140,000.00, for her pain and suffering in the form of a check payable to Petitioner, Briahna Bryant.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[11] In her brief and oral argument, Petitioner relied on a physical therapy record in arguing that she had a permanent loss of shoulder function. *See* Ex. 6 at 30-31. However, that record noted the deficits at the start of her post-operative physical therapy and proposed additional treatment designed to further her progress. Although the record provides evidence of Petitioner's post-surgical functioning prior to physical therapy treatment, it does not provide strong preponderant evidence that Petitioner's ongoing deficits are permanent.

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.